## THE STATE v. FRANK JOHNSON, Appellant.

**Division Two, February 18, 1908.**

1. **CONVICTION: Sufficiency of Evidence.** Before a defendant can be convicted of a criminal offense the testimony must be sufficient to authorize and support such conviction.

2. ————: ————: **Suspicion: Based on Other Crimes.** Where the most that can be said of the testimony is that it raises a suspicion that the defendant committed the murder charged, and this suspicion is aroused by proof that defendant had three days before the murder stole a pistol in St. Louis which was found on the railroad track near the house in Kansas City in which the crime was committed, and by proof that that pistol was of the same calibre as bullets found lodged in wood in the room in which the crime was committed, there is no evidence upon which a verdict of guilty can rest.

3. ————: ————: **Absence.** Where there is an entire absence of any testimony showing that the defendant or any one answering his description was near the premises at the time deceased was killed in his saloon in Kansas City, and the first time he was seen thereafter was soon after a train, that left Kansas City shortly after the murder, arrived in Independence, and no evidence was forthcoming that connects him with the murder except that a pistol which he stole in St. Louis was found on the railroad track near the saloon early next morning, a verdict of guilty cannot stand.

4. ————: **Application of Law.** The law should be universal in its application. Every citizen, whatever his station, is entitled to the presumption of innocence, and when charged with a crime substantial evidence touching his guilt must be adduced or he should be discharged.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford*, Judge.

Reversed and remanded.

*W. F. Riggs* for appellant.

The court erred in overruling the demurrer. The conviction of defendant is based upon circumstantial evidence alone; there is no direct evidence in the case.

Its weakness leaves the homicide shrouded in mystery. It is evident the jury substituted their own suspicions in place of proof, which the law will not permit. The State utterly failed to connect defendant with the killing of Carrothers. "Where at most the evidence adduced only raises a suspicion of guilt against the defendant, no verdict of guilty can be permitted to stand." Francis Case, 199 Mo. 671. "In a criminal case circumstantial evidence, to justify the inference of guilt, must exclude to a moral certainty every other reasonable hypothesis." 3 Ency. Ev., p. 92; State v. Spray, 174 Mo. 569; State v. Bailey, 190 Mo. 280; State v. Molineux, 168 N. Y. 264.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

The evidence of defendant's guilt was sufficient. Hinshaw v. State, 147 Ind. 362; State v. Benner, 64 Me. 289; State v. Dickson, 78 Mo. 448; State v. Ferguson, 162 Mo. 678; State v. Grubb, 201 Mo. 608; Wills, Circ. Ev., pp. 80 and 81; Walker v. State, 49 Ala. 400; People v. Arnold, 43 Mich. 305; 4 Elliott on Ev., sec. 2723. Where there is substantial evidence tending to show that the defendant is guilty, this court will not usurp the province of the jury in attempting to weigh such circumstances, but will defer to the verdict of the jury and the finding of the trial court. State v. Smith, 190 Mo. 706; State v. Payne, 194 Mo. 442; State v. Groves, 194 Mo. 452; State v. Williams, 186 Mo. 128; State v. Swisher, 186 Mo. 8.

FOX, P. J.—This cause is now pending in this court upon appeal by the defendant from a judgment of conviction in the criminal court of Jackson county for murder in the second degree.

On April 21, 1906, the prosecuting attorney of Jackson county filed an information charging the de-

fendant with murder in the first degree. The party charged to have been killed was one James Carrothers. This killing is charged to have occurred on December 5, 1905. At the January term, 1907, the defendant was put upon his trial. The evidence on the part of the State tended to prove that James Carrothers, the deceased, was a saloon-keeper, and that his place of business was located on the corner of First street and Grand avenue, in Kansas City, Missouri. He had been engaged in business at that place for something like eight months prior to the time he was killed, which was the evening of the 5th of December, 1905. The deceased's saloon faced the east and the bar was on the south side, and extended back to an ice-box. The saloon was fifty feet long by twenty feet wide, and was in a building which was isolated from other buildings. At 7:30 p. m., on December 5th, Clifford Murray, a street-car conductor on the Metropolitan Street Railroad, was passing the deceased's saloon, and saw the deceased's wife upstairs over the saloon, and heard her screaming. Mr. Murray jumped off of his car and entered the saloon. He found the dead body of the deceased sitting on the floor at the west end of the bar and leaning against the ice-box. His left hand was down by his side and his right hand was across his lap. In his right hand was a revolver, which contained one cartridge and four empty shells, and there was no one in the saloon, except a man who was dead drunk. Officer John Julian soon arrived, and identified this revolver as the one that the deceased usually kept in his saloon under the cash register. This cash register was sitting on the front bar with the keys turned toward the back of the bar, and had been removed. The furniture in the saloon indicated that there had been a fierce struggle between the deceased and the person who killed him. The deceased's shirt and collar were torn, and the floor of the saloon was dirty and the glasses were disarrang-

ed and some of them broken.  On the front bar was a
bullet mark, as if the shot had been fired on the outside
and glanced inside of the bar; there was also a bullet
mark in the ice-box.  This bullet was found by Officer
Halvey and produced at the trial.  It was a copper-
coated bullet, thirty-eight calibre.  Three other bullet
marks were found in the ice-box; one bullet went into
the wainscoting, and another one into the wall of the
saloon.  One bullet went under the bar and shattered
a glass demijohn, and another bullet hole was discover-
ed in the sink, where glasses are washed.  The cash reg-
ister was usually kept on the back bar, and the marks
on the bar indicated that it had very recently been
moved.  The police officers searched the neighborhood
of the saloon, and, failing to find any one, telephoned
to the police of Independence and other neighboring
cities to look out for persons on out-going trains.
Shortly after this shooting, Wm. J. Roberts, night-
watchman for the Builders' Sand Company, saw a tall
white man, seemed to be slender, who had on no over-
coat, running along the Missouri Pacific tracks, and
trying to catch an east-bound Missouri Pacific freight
train; this train was headed toward Independence.  At
that time the train was very near the crossing of Wal-
nut street, which was one block from Grand avenue.
Witness did not see him get on the train.  Mrs. Emma
White and little daughter were walking along the
street, near the Missouri Pacific track, between Grand
avenue and Walnut street, going to a grocery store,
when they heard a noise in the weeds and looked up;
they saw a man come from under some box cars on the
side track.  This man ran along the side of the cars
until he got to a path, and ran down the path, across the
road and toward the Missouri river.  He was holding
his right hand up and his left hand was down by his
side.  He was a tall, slender white man, and was wear-
ing dark clothes and a soft derby hat; witness did not

think he had on an overcoat. When Mrs. White reached the grocery store she first learned of the killing of James Carrothers. This witness did not recognize the defendant, who was then in court, as the man she saw running on the Missouri Pacific tracks, and she stated that she was not able to state that he looked like the defendant.

The operator at Independence, having received word to be on the lookout for persons coming into Independence on the night trains, called officers W. H. Rogers and Ed. Booth to the Missouri Pacific depot at Independence. They reached the depot at 9:15 o'clock on the evening of December 5th. They arrived at the depot about the time a Missouri Pacific freight train from Kansas City was coming in sight. The train stopped a short distance west of the water tank; the engine was taken loose and the conductor was requested to wait a few minutes, so the train could be searched. The train stopped before it reached the switch. At the place where the train stopped, west of the depot, there is a deep cut which extends for some distance on each side. The sides of the embankment are very high, so high that two overhead bridges are constructed across the track. The station agent assisted the officers in searching the train. One man jumped out from the car, two or three cars ahead of the caboose and started away from the train toward the depot. He was wearing an overcoat, had on a black cap and was a small man. He drew a revolver on the station agent, and the station agent allowed him to escape. He started toward the city and passed around the track toward Lexington. This man was not Frank Johnson. The two officers searched the train, looked under the cars, but failed to find any one in the cars, except two emigrants, a man and his wife. Witness W. H. Rogers testified that he did not see the defendant, Frank Johnson, until about the time the train was leaving the town

of Independence. He says that when he first saw John-
son he was about the switches, about two-thirds of the
way down from the depot to the bridge. He also stated
that he and Mr. Booth, when they saw him coming up
the track, walked down to meet him, arrested him and
took him to the depot. In answer to the question as
to how he was dressed he said: "I cannot describe his
clothes; he had on what looked like light color, but no
overcoat." Witness Rogers did not see the defendant,
Frank Johnson, get off the train; saw him for the first
time at Independence about the time the train was leav-
ing; some distance from the depot. Ed. Booth first
saw the defendant at Independence about the time the
train pulled out or shortly afterward. He was about
250 yards away on the railroad, near the point where
this train stopped. This witness said: "We walked
down and met him; he made no effort to run or get
away; we arrested him and took him into the depot and
searched him and found nothing on him; no money.
He gave his name as Frank Johnson; was a tall, slend-
er white man, well dressed in dark clothes, a soft derby
hat, but had on no overcoat. On being asked where he
came from, said he came from St. Louis, and had
jumped off the train at Little Blue, and hurt his neck
and chin." The defendant had a scratch on his chin
a little over on inch long, and on the left side of his
neck there were two or three scratches. One of the
witnesses gave as his impression that the scratches
were finger prints. The defendant said these marks
were made when he jumped off of the train and struck
a switch flag, east of Independence, as he was coming
in that evening. When Officer Halvey came to Inde-
pendence the defendant said that he had just been in
Warrensburg, but did not say where he came from.

Coroner Thompson visited the scene of the shoot-
ing a short while after it occurred and found upon the
body of the deceased an undershirt and celluloid collar,

which were torn, and a pair of pants; this clothing had bullet holes in them. A gun-shot wound entered between the thumb and the index finger of the deceased, ranging back about four inches, and coming out, making a ragged wound in the right hand. The second wound was found in the top of the head of the deceased made by a bullet, the bullet coming out under the chin and passing through the brain; this wound was a fatal one. The third wound grazed the ear, going through the collar and entering the body. A fourth wound entered the abdomen and passed entirely through the body; this was also a fatal wound. A fifth wound entered the neck of deceased; a sixth wound entered the breast of the deceased and passed through his body. Two other wounds were found on his body, but they were slight ones.

The morning after the alleged homicide a Missouri Pacific flagman, John Hall, was walking along the Missouri Pacific track at the foot of Main street, which is one block west of Walnut street, when a porter on the rear end of a passenger train called his attention to a pistol lying between the tracks. The pistol was on the ground by the side of the rail where a board had been nailed down for wagons to cross the tracks. This pistol was produced by the flagman, who testified that there was frost on it when he found it that morning at seven o'clock, and that it was frozen to the ground. This track was the one used by freight trains in going out of Kansas City toward Independence. That same morning eleven or twelve cartridges were found by Berry Ott, while walking along the Missouri Pacific track at the foot of Grand avenue. This witness did not say whether they were empty or loaded cartridges nor give the calibre of the gun or pistol they would suit.

John E. Drummond and Edward C. Theiss resided in St. Louis and were in December, 1905, in the employ of T. Dunn Loan & Mercantile Company, brokers, do-

ing business in the city of St. Louis. This firm handled revolvers. These two witnesses identified the pistol as found by witness Hall near the Missouri Pacific tracks in Kansas City by certain letters on certain parts of the pistol. While there was some discrepancy in their testimony as to these marks, their testimony tended to establish the identity of the pistol found by Hall. They also identified the defendant and testified that he had by force taken that pistol from the business house of T. Dunn Loan & Mercantile Company on December 2, 1905.

The operator at Independence testified that, when they were searching about the cars to see who was on them, a man jumped out who had on an overcoat and a little cap, and that he could not stop him for the reason that he drew a pistol on him and made his escape. He also stated that that man was not the defendant in this case. He further testified that, between twelve o'clock and the arrival of the Joplin freight on that date, which Mr. Booth and Mr. Rogers investigated and searched on its arrival from Kansas City at Independence, there was one train that arrived there at 3:20, going west towards Kansas City, which was called an L. & S. transfer; the next one was a train from St. Louis, and in going to Kansas City got to Independence at 4:57; that train was called No. 1. There was also an L. & S. train at 1:55; there was another L. & S. freight at 3:45 and an L. & S. freight at 4:30; then there was an L. & S. freight at 7:30. He further stated that there were two trains in and out of Independence between 6 and 9 o'clock on that evening, both of them west-bound; one got there at 7:35, that was the Sedalia train; the next one was the Lexington passenger, at 7:59.

This is substantially the statement of this cause as made by the Attorney-General representing the

State, and is a sufficient statement at least to indicate the nature and character of the testimony upon which the State must rely for the support of the judgment in this cause. At the conclusion of the case the defendant's counsel requested an instruction in the nature of a demurrer, directing the jury to acquit the defendant. This request was by the court denied. The court then instructed the jury upon murder in the first and second degree and manslaughter in the fourth degree, together with other instructions upon circumstantial evidence, reasonable doubt, etc. The cause was submitted to the jury and they returned a verdict finding the defendant guilty of murder in the second degree and assessing his punishment at ninety-nine years' imprisonment in the penitentiary. Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Sentence and judgment was entered of record in accordance with the verdict heretofore indicated. From this judgment the defendant prosecutes this appeal and the record is now before us for consideration.

## OPINION.

The leading proposition disclosed by the record in this cause is whether or not the testimony developed at the trial was sufficient to support the verdict as returned by the jury and the judgment of conviction upon it.

We have indicated in the statement of this cause substantially the nature and character of the testimony upon which it was submitted to the jury. We have also read in detail and re-read every line of testimony disclosed by the record now before us, and we have no hesitancy in saying that it is absolutely insufficient to support the verdict as returned by the jury. That Mr. Carrothers, the saloon-keeper, was brutally murdered, there is no sort of dispute; but that the State has failed

to connect the defendant, Frank Johnson, with such crime is equally clear. There is an entire absence of any testimony in the record showing that this defendant or anyone answering his description was anywhere near the premises where Mr. Carrothers was killed. The witnesses down on the railroad track who saw a man running as though making an effort to get on a moving freight train, fail to identify this defendant as being the man they saw, and they even do not go to the extent of stating that it is their impression that he was the same man. Mrs. White, one of the witnesses, says in positive terms that she is unable to state that the man she saw running down on the railroad tracks looked like the defendant then in court on trial. The general description may have some similarity, but the description given by the witnesses would be as equally applicable to thousands of other people as it is to the defendant. Neither one of the witnesses could tell whether he boarded the train or not, and the only identity of the defendant is when he is located some eight or ten miles from the place where the murder occurred. Mr. Booth, Mr. Rogers and the station agent or operator were at Independence when the train upon which it was supposed that the defendant was riding, arrived. They were keeping a close watch-out; neither of them saw him get off the train and neither of them is able to state whether he did get off or not. There was a man who rushed out from one of the cars or from under the cars, who drew a pistol upon the operator and he made his escape. The operator says that was not the defendant. The defendant was not discovered or seen until about the time the train coming from Kansas City had left the station. He then came along meeting witnesses Booth and Rogers; they arrested him, took him into the depot; he was searched and nothing found upon him that would indicate that he had any connection with the murder of the deceased Carrothers.

He stated in answer to questions propounded to him that he had arrived at Independence from an easterly direction, going west, and that in jumping off the train he received the little marks or scratches that were about his face and neck. There were two trains at least coming from the east, one arriving at Independence about 7:35, that defendant could have been on. The fact that he was not seen in Independence until after the arrival of this freight train, is by no means satisfactory evidence that he did not reach there from the east. In other words, upon the disclosures of the record, it is absolutely a guess or conjecture as to what train the defendant reached Independence upon. The only testimony which in any way tends to show that the defendant was in Kansas City is the testimony of the two witnesses from the city of St. Louis that identified the automatic Colt's pistol found near the railroad tracks the next morning after the killing of Carrothers, which they say the defendant forcibly obtained from their employer at his business house in St. Louis on December 2, 1905. Conceding that he was there and dropped that pistol near the tracks, and that that pistol was of the same calibre of the pistol with which deceased was shot, then in order to find that he was guilty of the murder of Carrothers you have simply got to jump at the conclusion, without any evidence upon which to base it, that he was in the saloon of Carrothers and shot him with this pistol and afterwards threw it down near the railroad tracks.

Whether the deceased was shot with an automatic gun of a thirty-eight calibre or some other sort of a gun of a similar calibre, the testimony fails to show. It will not be seriously contended that there are not in existence numerous automatic pistols of thirty-eight calibre and numerous other pistols of a similar calibre, and to find that the defendant, as disclosed by the record, shot and killed the deceased with a thirty-eight cal-

ibre automatic pistol, such finding could only be predicated upon a mere guess or conjecture.

That the defendant may have been guilty of robbery in taking from the brokers in St. Louis, with violence, the pistol found near the railroad tracks, is by no means sufficient to authorize his conviction of murder. It may also be said that the proper place for this defendant is in the penitentiary of this State, and that he is in fact guilty of the crime with which he is charged, but unless we have reached that point in the administration of the criminal laws of this State where we are willing to sanction the overruling of the repeated announcements by this court that before a defendant can be convicted of a criminal offense the testimony must be sufficient to authorize and support such conviction, then we see no escape from the conclusion that the testimony in this case was absolutely insufficient to support the verdict returned by the jury.

The most that can be said about the testimony developed at the trial of this cause is that it raises a bare suspicion that the defendant may have committed the murder charged, and this suspicion is aroused by the simple proof of the commission of the offense of robbery in the city of St. Louis.

The law should be universal in its application. It should be applied to every citizen alike. Whether he be humble or exalted he is entitled, when charged with a criminal offense, to have indulged in his favor the presumption of innocence; and the only safe rule for the protection of the citizen is that when he is charged with the commission of a criminal offense, to require at least the introduction of substantial evidence touching his guilt by the government seeking such conviction of the crime charged in the information or indictment.

This court has repeatedly recognized that just, humane and well-settled rule that in order to authorize the conviction of a defendant charged with a criminal

offense, it is not sufficient that there should be strong suspicions or even strong probabilities of his guilt, but the testimony when fully considered should be clear and abiding, fully satisfying the minds and consciences of the jury.

Conceding the truth of every fact developed by the State in the trial of this cause, and viewing such facts in as strong and favorable light to the State as they may properly be susceptible of, yet they fall far short of furnishing sufficient testimony of the guilt of the defendant of the murder charged in the information in this cause.

Unless the State is able to introduce more satisfactory evidence of the guilt of the defendant of the offense charged in the information than is disclosed by this record, the trial court should promptly order the discharge of the defendant.

Entertaining the views concerning the sufficiency of the testimony to support the verdict of the jury as heretofore indicated, the judgment should be reversed and the cause remanded. It is so ordered.

All concur.