State v. Henke.

THE STATE v. HARRY A. HENKE, Appellant.

Division Two, April 5, 1926.

1. **APPELLATE PRACTICE: Sufficient Evidence.** In passing upon the sufficiency of the evidence to support the verdict in a criminal case, all substantial testimony offered by the State and tending to implicate the accused should be taken as true, and every legitimate inference that may be drawn from it indulged; and thus considered, if the substantial evidence tends to support the verdict of guilty, it must be allowed to stand, unless reversible error was committed in the progress of the trial.

2. ———: **Substantial Evidence: Rigor Mortis: Consistent Circumstances.** Testimony growing out of the experience of the witness as

a physician and as coroner for ten years, during which time he had examined thousands of dead bodies, that when he reached the house at 6:30 in the evening the body of deceased except her neck was perfectly stiff, and that, in his opinion, she had then been dead from twelve to fourteen hours, corroborated by the smell of her decomposed blood indicating that she had been dead that long, is substantial evidence that when defendant' left the house at 6:30 in the morning deceased was then dead; and.all the circumstances being consistent with the coroner's testimony and very strongly showing that no one else had access to the house during the entire day and that no one else except defendant could have killed her, and all the circumstances being consistent with his guilt and with each other, a verdict finding him guilty of murder in the second degree was supported by substantial evidence.

3. MOTIVE: Association with Other Women. Where proof of guilt is purely circumstantial, proof of the motive for the commission of the crime is very important. The photograph of a woman other than his wife found in the clothing worn by defendant on the day his wife's dead body was found in their house, and an admission that he had been associating with other women and had deceived his wife, tend to furnish a motive for killing her; and although, he denies having made the admission and his denial is corroborated by other witnesses who were present'when the admission was made, the fact whether the admission was made is nevertheless for the jury to decide.

4. SUFFICIENT EVIDENCE: Murder: Impeachment by Verdict for Second Degree. Where the jury could well have found defendant guilty of murder in the first degree, if they found he killed his wife, their verdict finding him guilty of murder in the second degree and assessing his punishment at twenty years' imprisonment does not cast doubt upon the certainty of his guilt in their minds, where the situation authorized a verdict for murder in either degree and instructions pertaining to murder in both degrees were given.

5. INSTRUCTION: Deliberately. Deliberation is not an element of the crime of murder in the second degree, and where defendant was convicted of that crime the definition ,of the word "deliberately" contained in the instructions on murder in the first degree need not be considered.

6. ———: Murder in Second Degree. Where the homicide was accomplished by the use of a deadly weapon upon a vital part of the body, and there is no direct proof concerning the facts immediately attending the killing, an instruction on murder in the second degree is authorized.

State v. Henke.

7. ———: **Manslaughter.** Where no fact tending to reduce the killing from murder in the second degree to manslaughter is produced, no instruction on manslaughter is authorized.

8. ———: **Motive.** An instruction telling the jury that, if they find there was no motive on the part of defendant to kill deceased, the absence of such motive is a circumstance in his favor; but, if they believe him guilty beyond a reasonable doubt, they should not acquit him merely because of the failure to show motive for the crime, is more favorable to defendant than he is entitled to, where there is evidence of motive.

9. **EXHIBITIONS TO JURY: Blood-Stained Garments: Skull of Deceased.** If appellant considers that error was committed because the prosecutor at the trial constantly exhibited to the jury the blood-stained garments found upon deceased, and her skull, which was removed at the post-mortem and introduced in evidence, it is his duty to point out whereat in the record such exhibitions occurred.

10. **WITNESS: Calling: Hollow Pretense.** A direction by the prosecuting attorney in the presence of the jury to the sheriff to call as a witness a person who had not been subpoenaed and for whom no subpoena had been issued, the State's theory being that the witness was the woman with whom defendant had formed illicit associations and supplied the motive for the crime with which he was being tried, was an incident of the trial that cannot be reviewed on appeal where the appellant neither objected nor excepted when it occurred. The trial court cannot be convicted of error unless given an opportunity to make a ruling, and to correct an error if one has been committed.

11. **ARGUMENT TO JURY: Deduction from Evidence: Adultery.** An argument to the jury that defendant, charged with murdering his wife, has been guilty of adultery is a permissible deduction from his alleged admission that he had been going with another woman, had deceived his wife and the finding of a woman's photograph in his clothing.

12. **REVERSAL: Newly-Discovered Evidence.** Newly-discovered evidence which is merely cumulative or of an impeaching character does not justify a reversal where the trial court has refused to grant a new trial.

13. **PROVINCE OF COURT AND JURY: Substantial Evidence.** The only method of determining the facts in a felony case known to our Constitution and laws is a verdict by a jury of twelve men under the supervision of a trial judge; and where there is substantial evidence to support their verdict of guilty, and the trial court has committed no reversible error during the presentation

of the evidence, the giving and refusing of instructions. and the arguments to the jury, their verdict is conclusive upon the appellate court, although they may reasonably have believed his denial and concluded that his guilt was not sufficiently established.

Criminal Law, 16 C. J., Section 2240, p. 896, n. 85; Section 2710, p. 1183, n. 19; p. 1184, n. 24; Section 2754, p. 1242, n. 3|8; 17 C. J., Section 3332, p. 62, n. 94; Section 3462, p. 169, n. 8; Section 3569, p. 223, n. 40, 42 New; Section 3|589, p. 250, n. 5; p. 252, n. 17; Section 3593, p. 255, n. 55; Section 3599, p. 271, n. 41; p. 272, n. 43; Section 3729, p. 359, n. 64; p. 360, n. 68. Homicide, 30 C. J., Section 358, p. 147, n. 70; p. 148, n. 71; Section 406, p. 180, n. 38; Section 529, p. 285, n. 38; Section 560, p. 314, n. 54; Section 570, p. 322, n. 65; Section 572, p. 325, n. 82; Section 576, p. 3|28, n. 2; Section 641, p. 396, n. 23; Section 650, p. 404, n. 93; Section 659, p. 414, n. 79; Section 715, p. 450, n. 7, 8; Section 722, p. 452, n. 38, 39.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

*A. E. L. Gardner* for appellant.

(1) The evidence is insufficient to support the verdict of the jury and to authorize the conviction of defendant of murder in the second degree, and the instruction directing the acquittal of the defendant of the charge against him, in the nature of a demurrer offered and requested by the defendant at the close of the State's case, should have been given. State v. Crabtree, 170 Mo. 657; State v. Gordon, 199 Mo. 596; State v. Francis, 199 Mo. 693; State v. Bass, 251 Mo. 107; State v. Johnson, 209 Mo. 357; State v. Scott, 177 Mo. 673; State v. King, 174 Mo. 662; State v. Frisby, 204 S. W. 3; State v. Larkin and Harris, 250 Mo. 234. (2) The conduct of the special prosecutor was highly reprehensible and prejudicial, not only in constantly exhibiting to the jury a blood-stained garment found upon the deceased after the murder, but the blood-stained sheets and pillow cases whereon she lay when found, and also the skull of the deceased. State v. Pearson, 270 S. W. 347. (3) The action of the prosecuting attorney and special prosecutor in requiring the sheriff to call, within the hearing of the jury as well as outside the jury room, the name of Marie Burke, was highly prejudicial and was

done merely to impress the jury that Marie Burke was a paramour of defendant, when, in fact, no such person had been subpoenaed by the State and no such person was known to be in attendance at the trial of the case. State v. Burns, 228 S. W. 768; State v. Lasson, 292 Mo. 168. (4) The court erred in permitting the special prosecutor, over the objection of defendant, to argue to the jury that defendant was guilty of the crime of adultery, as a motive for the crime charged against the defendant, when there was no evidence in the case authorizing such an argument. State v. Lasson, 292 Mo. 172. (5) The failure by the State to show motive on the part of defendant to commit the crime charged against him authorizes his acquittal. State v. Francis, 199 Mo. 671; State v. Wheaton, 221 S. W. 26.

*North T. Gentry,* Attorney-General, and *Harry L. Thomas,* Special Assistant Attorney-General, for respondent; *Robert A. Roessel* of counsel.

(1) The *corpus delicti* was clearly proven. The dead woman was found under circumstances which indicated most clearly that she had met her death by a murderous weapon in the hands of some person. State v. Hall, 231 S. W. 1004; State v. Cox, 264 Mo. 408; State v. Schyhart, 199 S. W. 211. Circumstantial evidence is sufficient to support a conviction for murder. State v. Concelia, 250 Mo. 411; State v. Barrington, 198 Mo. 110. There are no hard and fast rules as to the sufficiency of the evidence to support a conviction as in the present case, but each case must be determined in the light of its own facts. State v. Bowman, 294 Mo. 259. The evidence was sufficient. State v. Barrington, 198 Mo. 110; State v. Hall, 231 S. W. 1001; State v. Poor, 228 S. W. 812; State v. Concelia, 250 Mo. 411; State v. Bowman, 294 Mo. 245. The body was carefully laid out upon the bed with the instrument with which she was evidently murdered by her side. If the deceased was killed in the house by one unfamiliar with the neighborhood, the act would be characterized by haste and her body would have been found where she was felled.

State v. Wheaton, 221 S. W. 31. (2) The record shows the skull of deceased was introduced in evidence without objection or exception, and if exhibited in the final argument no objection thereto was made. State v. Lloyd, 263 S. W. 214. (3) Articles found in search of defendant's house during his absence were admissible and were competent evidence to show blood stains on garments shown by evidence to be the defendant's. State v. Hall, 231 S. W. 1004. Further, the bloody clothing admitted in evidence was not objected to for the reason now assigned, and no objection was made to the exhibition of such articles if they were exhibited in final argument. Objection made related only to the circumstances under which these articles were found. (4) Appellant's assignment of error in permitting the calling in court of the name of an absent witness is not for review, there being no objection made or exception saved in this regard. (5) It was not improper for counsel to suggest the defendant guilty of adultery, there being competent evidence from which this conclusion might reasonably be drawn. Conclusions in accord with the evidence and to be reasonably inferred therefrom, may be stated. State v. Peak, 292 Mo. 249; State v. Gallagher, 222 S. W. 468. (6) The good reputation of the defendant for being a man of good habits having been placed in issue, it was proper for the prosecuting attorney to inquire if the witness knew of the defendant's association with other women. State v. Cooper, 271 S. W. 472; State v. Gurnee, 274 S. W. 60. (7) There was no request for such an instruction or objection or exception to the failure of the court to so instruct. Further, there was no evidence to support such an instruction, the final argument upon which the claim for such an instruction is now based not being made until after the jury was instructed. State v. Boston, 256 S. W. 744; State v. Burrell, 298 Mo. 672; State v. Harp, 267 S. W. 846. (8) The unsworn statement alleging newly-discovered evidence was insufficient. State v. Nickens, 122 Mo. 607; State v. Smith, 247 S. W. 157; State v. Whitsett, 232 Mo. 511; State v. Estes, 209 Mo. 288; State v. Church, 199 Mo. 605; State

v. Speritus, 191 Mo. 24; Mahany v. Rys. Co., 286 Mo. 601.;
State v. Emmons, 285 Mo. 54; State v. Hewitt, 259 S. W.
782; State v. Wilson, 223 Mo. 173; State v. Flutcher, 166
Mo. 582; State v. Neasby, 188 Mo. 467; State v. Bowman,
161 Mo. 88; State v. Walker, 232 Mo. 252; State v. Mc-
Cullough, 171 Mo. 571. The trial court must have found,
from all the evidence, that the newly-discovered evidence
would not probably cause a different result and the finding
upon this point is largely a question for the trial court.
Where there is not a probability of a different finding, the
refusal to grant a new trial upon newly-discovered evi-
dence is not error. State v. Smith, 247 S. W. 158; State
v. Finn, 199 Mo. 597; State v. Rippey, 228 Mo. 342; State
v. McLaughlin, 27 Mo. 111. Further, the newly-discovered
evidence, as outlined by affidavits filed, was either pure
hearsay or of an impeaching nature.

BLAIR, J.—Appellant was charged with murder in
the first degree for the alleged killing of his wife. The
jury found him guilty of murder in the second degree and
assessed his punishment at imprisonment in the peniten-
tiary for twenty years. He was sentenced upon such ver-
dict and has appealed to this court.

As the evidence was wholly circumstantial and the
chief contentions of appellant are that the evidence did
not make a case for the jury and that the trial court should
have instructed the jury to find appellant not guilty, the
facts developed by the evidence should be fully stated in
order to dispose of such contentions intelligently.

At about six o'clock P. M., July 11, 1924, appellant's
wife, Marie Henke, was found dead in her bed. The cause
of death was a blow on the head with some blunt instru-
ment. There was no direct proof concerning the identity
of the person who caused her death. Appellant was twen-
ty-five years old. His wife, to whom we will frequently
refer as "deceased," was twenty-four years old. They
had been married about two years. They lived at 1721
Beulah Place in Richmond Heights, St. Louis County, in
the home owned by Joseph Yost. Mrs. Yost was the moth-

er of deceased. Lucille, a ten-year-old daughter of Yost and wife, lived with her parents. Edward Meister and wife also lived in the same house. Joseph Yost, the appellant and the deceased worked in St. Louis. At the time in question, Mrs. Yost, Lucille Yost and Mrs. Meister were visiting in Seattle, Washington. Meister was a traveling salesman and was then in Cincinnati, Ohio. This left Joseph Yost, appellant and his wife as the only occupants of the home on July 10th and 11th. The house was on the west side of the street, facing the east. Appellant and deceased occupied the southeast front bedroom on the second floor and Yost the southwest bedroom on the same floor. A small hall leading to the stairs connected these two rooms.

On the night of July 10th Mrs. Thompson, who lived directly across the street, and Mrs. Manahan visited the Henkes. Mrs. Thompson went home about 10:20 P. M. About 10:30 P. M., appellant and the deceased accompanied Mrs. Manahan four or five blocks, where she boarded a street car to ride to her home. A pleasant evening had been spent. Ice cream and cake were served. Joseph Yost was at home during the evening. After locking the rear door of the house, he had retired while appellant and deceased were accompanying Mrs. Manahan to the street-car line.

Two closets opening into the respective bedrooms separated the room occupied by Yost from the room occupied by appellant and his wife. Yost heard them return to the house, but did not hear them go upstairs. He left his door leading into the hall partly open. He heard nothing during the night. With the exception of appellant, Mrs. Manahan was the last person known to have seen Mrs. Henke alive.

On the morning of July 11th Yost arose at about 5:15 o'clock. As he passed down stairs he observed that the door to the Henke bedroom was open. He glanced in, but his view included only the lower end of the bed. He then saw the covered-up forms of the lower limbs of two per-

sons lying on the bed. He went down stairs, went out in the back yard and attended to his chickens, returned to the house, hooked the rear screen door, prepared a frugal breakfast, including a pot of coffee, and left the house at about 6:15 A. M., leaving the front door open, but closed the screen on that door. Before he left the house he heard some one moving about upstairs in the hall described.

Appellant testified that he got up about 5:50 o'clock, dressed, went to the bathroom, shaved and returned to the bedroom. Deceased was then awake and complained of feeling badly and announced that she would not go to work that day. She had not worked the previous day. She spoke of going to the home of Mr. and Mrs. Dunn in North St. Louis that evening. If she went, appellant expected to join her there. Appellant went down stairs and drank a cup of coffee, which he found already prepared. He then returned to the bedroom and kissed his wife good-bye and left the house at about 6:30 A. M. He closed and locked the front door when he left. In walking the four blocks to the street-car line he was joined by and talked with one Doerbaum, who rode into the city on the same car with appellant, but sat in a different seat. Doerbaum testified to such meeting and the time thereof. Appellant arrived at his place of work at about 7:45 A. M., and punched the time clock, which registered the exact moment. He remained at his place of work all day and apparently performed the customary duties of his employment in the usual manner. He punched the time clock upon departing for home at the usual time. He arrived at home about 6:50 P. M.

Appellant testified that he telephoned to his home at about 12:30 P. M. He received no response and called up the office of the Standard Oil Company, where his wife worked, and found that she had not gone to work. He then called up Mrs. Thompson, who lived across the street, and asked her if she had seen his wife and was informed that she had not seen her. She stepped to her front porch and looked across the street at appellant's request. She

then reported that everything was locked up over at his house. Appellant produced witnesses who corroborated his testimony as to his act of calling up some one and getting no answer and calling up some one else and also that some one called up the Standard Oil Company and asked if deceased had come to work. These witnesses fixed the time of such calls at approximately the time fixed by the appellant. Mrs. Thompson testified that she received the call from appellant about 8:30 A. M., and not during the noon hour. There was evidence that she had made statements tending to show that her telephone conversation with appellant took place about noon. The purpose of the telephone call to his wife, as stated by appellant, was to learn whether she intended going to the Dunns in North St. Louis that evening. In that event, he planned to join her there before going home. It does not appear that appellant called any more. He apparently assumed that his wife had abandoned the visit. Hence he came directly home, where he claimed first to have learned of his wife's death. The theory of the State is that the telephone calls were not in good faith, but were made by appellant for the purpose of manufacturing evidence in his own behalf by creating an inference that he had no knowledge that anything had happened to his wife.

When Joseph Yost returned home at about 5:50 o'clock in the evening, he found the front door locked and was required to open the door with his key. He passed through the house and laid down some packages he had brought home. He discovered that the rear screen door was unlocked. He went out and fed his chickens and called to Mrs. Henke, thinking she was in the back yard. He returned to the house and went upstairs to change his clothes. As he came to the top of the stairs he looked into the Henke bedroom and saw the room was in great disorder and went in. Articles had been dumped out of a cedar chest and dresser and chifferobe drawers into a pile onto the floor. He saw his step-daughter, the deceased, lying in bed apparently asleep. Referring to the appear-

ance of robbery in the room, he said: "Well, they got us at last." When he got no response from Mrs. Henke, he raised the bed cover and took hold of her and discovered that she was dead.

Yost immediately gave the alarm, and neighbors, officers and physicians arrived promptly. The coroner, Dr. Bracy, arrived at about 6:30 P. M. He found that deceased's skull had been crushed by a blow delivered by some blunt instrument. All of the body, except the neck, was perfectly stiff. From his experience as a physician and as coroner for ten years Dr. Bracy testified that in his judgment deceased had been dead from twelve to fourteen hours at the time he first examined the body. The death blow had been inflicted by a heavy Stillson wrench, which was found upon the floor of the bedroom. The wrench had blood and hair upon it. The body had apparently lain on the floor for some time, as a large pool of coagulated blood was found there with hair stuck in it. The body also appeared to have been washed, encased in a clean night gown and laid on the bed upon clean sheets, which did not appear to have been slept upon. Clean pillow slips had been placed upon the four pillows, and these had been placed, two on each side of deceased's head, in such manner as to conceal the wound on her head. Considerable blood.had flowed from the head wound after the body was placed on the bed and had soaked the bed and mattress beneath and had run through upon the floor below.

The wrench, with which the fatal blow had apparently been inflicted, was a tool which usually rested on the floor of the rear vestibule leading out from the kitchen to the back yard, where it was used as a door stop. Yost testified that he did not see the wrench in its accustomed place before he went to work that morning. However, witnesses were introduced by appellant whose testimony tended to show that Yost had said that he saw the wrench in its accustomed place in the vestibule that morning before he went to work.

313 Mo.—40.

Witness Maloney testified that, on the evening when the body was discovered, he observed that the alarm clock in appellant's bedroom had stopped at 2:45 o'clock. He examined it then. The clock was offered in evidence after said witness testified that it was in the same condition as when he first saw it. Appellant testified that before he retired he wound the clock and the alarm and set the alarm for 5:45 and that the alarm went off the next morning. Mr. Yost did not hear it go off. The State made much of this incident in arguing the case below and here. We were at a loss to find the proof in the record to support the argument that the clock had stopped before the alarm went off until we read the argument of counsel in the trial court. There Mr. Roessel, without objection from the defense, made the following argument:

"You gentlemen will remember that he [appellant] testified he wound that clock up tight that night. Each and every one of these springs are absolutely tight. I don't know, you might try to wind it. You will remember he said it was set for 5:45. You will remember he said it went off at 5:45. It was set for 5:45 you will observe. (Showing jury). It must still be going off, because you can't have a tight spring and a set alarm. Mr. Yost testified he didn't hear that alarm that morning."

Thus it appears that the alarm clock was before the jury and that the jury could see for itself whether the springs operating the clock and the alarm mechanism were wound up tight or not. It could see whether the alarm was set for 5:45 and whether the alarm had gone off. If an inspection of the clock itself did not give this rather important proof, objection would no doubt have been made to the argument. Counsel argued from these facts that something occurred in the room that night to stop the clock. While such argument was mere conjecture, the jury had the right to consider such evidence along with the other evidence in the case. Standing by itself, the fact that the clock stopped during the night would have little significance. Every man on the jury had probably had the experience of his alarm clock stopping with-

out any apparent reason. But the tight springs indicated that the clock did not run long after it was wound. If the alarm clock had not gone off, though set for 5:45, such fact indicated that the clock stopped before 5:45 A. M., and not during the following afternoon and before the body was discovered.

After leaving the street car and before reaching home appellant met people who informed him of his wife's death. He ran home and gave indications of great shock and uncontrollable grief over her death. He apparently became hysterical and collapsed and was taken across the street to the home of Mrs. Thompson. The testimony of a physician tended to throw doubt upon the genuineness and sincerity of such hysteria and collapse. A reading of the cold record leaves the impression that, if appellant was feigning, he certainly must have been a clever actor. After the funeral both appellant and Yost were taken into custody and detained a number of hours. Appellant was afterwards arrested and charged with the murder of his wife.

The foregoing is merely a sketch of the evidence contained in the voluminous record. Other facts and circumstances in evidence will be considered in passing upon the question of whether or not the facts and circumstances shown tended to prove that appellant killed his wife. At the outset it should be stated again, as this and other courts have frequently held, that, in passing upon the sufficiency of the evidence in a criminal case, all substantial testimony offered by the State and tending to implicate the accused should be taken as true and every legitimate inference which may reasonably be drawn from such testimony should be indulged. After applying such rule, if there is substantial testimony which tends to support the verdict of guilt found by the jury, its verdict must be allowed to stand, unless reversible error was committed in the progress of the trial. [State v. Concelia, 250 Mo. 411; State v. Sassaman, 214 Mo. 695, l. c. 738; State v. Page, 212 Mo. 224, l. c. 242; State v. Fogg, 206 Mo. 696, l. c. 717.]

It must be conceded that, had the jury found appellant not guilty, instead of guilty, because it deemed such guilt not sufficiently established, its verdict would likewise not have been subject to legitimate criticism. In other words, the jury had the right to believe appellant's denial of guilt. After a most careful and painstaking reading and study of all the evidence and mindful of the rule above announced, that all evidence having any tendency to prove the guilty connection of the accused with the crime must be taken to be true and that the State is entitled to all inferences logically to be drawn from such evidence, we have concluded that there is substantial evidence of facts and circumstances which point to the guilt of appellant and exclude the guilt of any other person. We will proceed to discuss some of such facts.

Proof most damaging to appellant—and it must be taken as true for our purpose—was the testimony that the stiffness of deceased's body, called *rigor mortis,* and the smell of decomposed blood indicated that deceased had been dead from twelve to fourteen hours before her body was examined by the coroner. We are aware that Dr. Bracy was subjected to vigorous and possibly effective cross-examination and exhibited some temper and was possibly somewhat shaken, yet he adhered stoutly to his opinion that death had occurred twelve to fourteen hours before he saw the body, which was about twelve hours after appellant testified he left deceased alive in bed. Dr. Bracy testified that, as physician and coroner, he had examined thousands of dead bodies. The exact time of death in most of these cases was doubtless known to him at the time he examined the dead bodies. This gave him a wide and extended experience as to *rigor mortis.* Other physicians testified that the length of time a body had been dead could not be certainly or accurately told from the state of *rigor mortis.* Their testimony indicated that deceased might have been dead a much shorter time than that fixed by Dr. Bracy. None of the other physicians, however, gave it as his opinion that deceased could not have been

dead for twelve or fourteen hours before the body was discovered. One of the physicians said that she might have been dead from two or three hours up to the time she was last seen alive. The defense offered no expert testimony which tended to show that deceased could not have been dead as long as Dr. Bracy fixed the time. The jury had the right to accept Dr. Bracy's testimony. Accordingly, there was substantial testimony which authorized the jury to find that deceased was dead when appellant left his home on the morning of July 11th. From such fact the jury was authorized, in connection with the other circumstances in the case, to have found that appellant was responsible for her death. Under the circumstances shown in evidence, he was the only person who could have killed her, if she was dead when he left home.

Another important piece of evidence, which tended to show that deceased was dead when appellant left his bedroom that morning, was Yost's testimony that he did not see the Stillson wrench in its accustomed place by the vestibule door when he went out to feed his chickens that morning. Although there was evidence which tended to impeach Yost on this point, he adhered to his story and the jury had the right to believe it. If the wrench was gone at that time, it had undoubtedly been taken to deceased's room and employed to inflict the fatal blow before Yost went down stairs and before appellant left the deceased.

Then there was the circumstance in connection with the stopping of the alarm clock at 2:45 A. M. Standing alone this bit of evidence would have no great significance. Taken in connection with all the other circumstances pointing toward the guilt of defendant, the jury could properly take it into consideration. If the clock spring and the spring controlling the alarm mechanism were wound tight and the alarm had not gone off, the jury had the right to infer that something occurred in the bedroom that night to stop the clock at the time indicated. The stopping of the clock might have been due to other

reasons not connected with the deceased's death, but the jury had the right to consider such evidence.

There was evidence of undoubted strength and credibility concerning the existence of blood spots upon the pajamas belonging to appellant and upon other articles of cloth found in the room and about the house. The pajamas gave the appearance of having been washed and dried, but not ironed after the blood stains were on the garment. Appellant made no effort to explain the presence of such blood stains, except to testify that the pajamas has not been worn by him since he was sick in March. There was proof of blood stains upon the ball on the end of the chain with which the electric light in deceased's bedroom was switched on and off. The presence of the latter blood stain suggests the touch of a blood-stained hand in switching the light on or off. The light would not ordinarily be required in daylight hours and this suggests its use during the hours of darkness. At that season of the year it had been daylight at least two hours before appellant claims to have left his wife to go to the city.

Appellant testified that he did not go to the rear door before he left the house. Yost's testimony was that he locked the rear screen. Appellant said he closed and locked the front door as he left. The house was therefore sealed after both had gone. There was evidence tending to show that there had been no violence to doors or windows whereby an entrance from the outside could have been effected after appellant left the house. When Yost returned home in the evening the front door was locked, but the rear screen door was unhooked. In the absence of proof of forced entrance through said rear screen door, the inference is justified that it was unhooked from the inside. Who unhooked it? Either appellant or deceased unhooked it or Yost failed to hook it as he said he did. As deceased still had on her night gown and as the post-mortem disclosed that her stomach was entirely empty, the inference might well be drawn that, if she was alive when appellant left the house, she did not go down stairs or

eat any breakfast after appellant left the house.  The jury had the right to believe Yost's testimony that he had hooked the screen door.  In spite of his denial, the jury. had the right to believe that appellant was the only person inside of the house who could have unhooked the screen. No one was seen about the place.  Yost kept two dogs in the basement which barked noisily upon the approach of strangers.  No one heard these dogs bark during the day. Mrs. Haag lived just north of the Yost home and for several hours that morning sat and worked in a position where the rear screen door was within her view.  She saw no one and heard no barking of dogs or other noise.  It is not a far-fetched inference, if appellant in fact killed his wife, that he unhooked the rear screen door after Yost left and before he left the house to suggest the possibility that some one effected an entrance to the house that way and killed the deceased.

The circumstance of blood and hair on the floor indicates that deceased lay upon the floor after she was struck and was placed upon the bed afterwards.  To our mind the most puzzling circumstance is the fact that the body was cleansed and afterward laid upon the bed, upon clean sheets and pillow slips, in such a position as to resemble sleep.  If deceased was killed by any one else than appellant, immediate and undiscovered escape would have been the most natural impulse and it would appear extremely unlikely that such a person would linger long enough to attend to the body in this fashion.  Putting the body on the bed with clean sheets and pillow slips might be regarded as an effort to throw suspicion upon appellant and to disprove robbery or rape.  But if such was the purpose, the disordered condition of the room itself pointed to robbery.  If appellant killed deceased and mussed up the room to indicate robbery, why did he cleanse her body, dress her in clean clothes and put her body upon a clean bed and cover her up instead of leaving the body upon the floor in the midst of its own blood?  There was no evidence of rape on deceased's body.  That deceased was

killed by some intruder bent on robbery is extremely unlikely, because her rings—one of them a diamond—were left on her fingers and jewelry and money were also in plain sight and left undisturbed.

One thing seems absolutely certain, the homicide did not occur between the time Yost left the house and the time appellant left. It must have occurred either before or after that interval of time. Appellant could have killed his wife without making any noise by striking her with the wrench at some time between 11 or 11:15 P. M., and the time Yost arose. Appellant might have washed the body and placed it on the bed and lain down beside it long enough for Yost to see the forms of two persons upon the bed as he went down stairs and thus divert suspicion from himself. This, at least, was the theory of the State. After Yost left the house, appellant had sufficient time to put the room in disorder, but did not have time in that interval to have killed the deceased, washed and dressed the body and dressed the bed, laid the body upon it and washed the various articles of cloth upon which evidences of blood stains were afterward found.

Where proof of guilt is purely circumstantial, proof of the motive for the commission of the crime is very important. The photograph of a woman other than his wife was found in the clothing worn by appellant on the day his wife's dead body was found. The State offered evidence tending to show that, when newspaper stories got out that appellant had been associating with another woman, he admitted that he had deceived his wife and had been with another woman at times when he had been away from home in the evenings supposedly engaged in work or at bowling. Appellant denied having made any such admission and his denial thereof was corroborated by persons said to have been present when such admission was made. The fact of such admission was nevertheless for the jury. If the jury believed that defendant had been associating with another woman, such fact tended to furnish a motive for the homicide.

Appellant offered evidence that he bore a good reputation for peace and quiet and for being a law-abiding citizen. One witness testified that he bore the reputation of being a man of good habits. The State offered no proof to the contrary. Appellant and deceased were communicants of the Catholic church. They lived a happy and contented life, so far as the evidence discloses. There is no evidence that their relations were other than the affectionate relations usually found to exist between happily married people. While there was some evidence that police protection was not afforded to the community where appellant and deceased lived and that two strangers in a taxicab inquired for Beulah Place about 6:30 on the morning of July 11th, no stranger was seen about the Yost place. The evidence discloses that a number of families lived close to the Yost home. The men in the taxicab were not shown to have been in the neighborhood. The extreme improbability of any person or persons bent on harm to Mrs. Henke going to the scene in a taxicab and thus advertising their presence is readily apparent. A reading of appellant's testimony indicates intelligence and strength of character. In other words, such testimony reads well. We have not the benefit of the appearance and manner of appellant in giving his testimony. It was peculiarly the opportunity and function of the jury to judge his testimony by such considerations. If there appeared during his occupancy of the witness stand the hesitant manner, the furtive look or other appearance tending to weaken his testimony, the jury saw the same and accordingly determined what weight and credit to give to his testimony. In that respect, jurors have an immeasurable advantage over appellate judges who can only read the cold record.

The trial judge, a lawyer of great ability and a judge of many years' experience in presiding at trials, both civil and criminal, also saw the witnesses and observed their demeanor. He passed upon the motion for new trial and thus approved the verdict of the jury. His ruling upon the sufficiency of the evidence to support the verdict is

not conclusive upon this court. It merely fortifies us in our independent conclusion from a study of the typewritten record that there was substantial evidence which authorized the verdict reached by the jury.

The verdict of guilt of murder in the second degree and assessment of only twenty years' imprisonment in the penitentiary might be said to cast doubt upon the certainty of appellant's guilt in the minds of the jury. It is true, that the jury could well have found appellant guilty of first degree murder, if it believed he killed his wife. But such fact cannot be used to impeach the verdict rendered. The proof here discloses no facts immediately attending the killing, other than that deceased was killed by the use of a deadly weapon intentionally used at a vital part of her body. The situation called for instructions upon first and second degree murder and the jury was well within its rights in finding the appellant's guilt to be in the lesser degree. [State v. Snow, 293 Mo. 143; State v. Kyles, 247 Mo. 640; State v. Minor, 193 Mo. 597; State v. Young, 119 Mo. 495.] The evidence does more than to raise a mere suspicion of appellant's guilty agency in his wife's death, such as was held insufficient in such cases as State v. Singleton, 294 Mo. 346, and State v. Buckley, 309 Mo. 38, 274 S. W. 74, and cases cited and discussed therein.

The *corpus delicti* was admittedly proven, that is to say, there is no possible doubt that the dead body was that of Mrs. Henke and that her death was due to the criminal agency of some one. The sole question was whether she was killed by appellant or by some one else. In support of his contention that the evidence was insufficient to support the verdict, appellant cites the following cases: State v. Crabtree, 170 Mo. 642, l. c. 657; State v. Gordon, 199 Mo. 561, l. c. 596; State v. Francis, 199 Mo. 671, l. c. 693; State v. Bass, 251 Mo. 107; State v. Johnson, 209 Mo. 346, l. c. 357; State v. Scott, 177 Mo. 665, l. c. 673; State v. King, 174 Mo. 647, l. c. 662; State v. Frisby, 204 S. W. 3; State v. Larkin and Harris, 250 Mo. l. c. 234.

In the Crabtree case the deceased was found in the river with her neck broken. Her body was probably

placed there after death. While there was some evidence that defendant had been seen in the vicinity where deceased must have been killed, the evidence did not tend to exclude the possibility that she was killed by some one else. There was no reason shown why Crabtree should have killed her or wanted her out of the way.

In Gordon's case, his wife was killed by an unexplained discharge of a shotgun. If she was murdered, only Gordon or a nine-year-old boy could have committed the act. Yet, the death might have been caused by accident or have been due to self-destruction. No sufficient motive was shown and the circumstances proven were as consistent with innocence as with guilt.

The Francis case was one of poisoning with carbolic acid. There was some unsatisfactory evidence of identification of Francis as having been in the vicinity about the time, but the evidence overwhelmingly tended to show that he could not possibly have been present. There was evidence that deceased was in a two-months' condition of pregnancy, but no evidence that either Francis or deceased knew it. He had no motive for killing her, because he wished to continue the illicit relation. There was no evidence that Francis had purchased carbolic acid. The theory of suicide was precluded by evidence of attendant violence in addition to the poisoning.

In Bass's case, his wife's body was largely consumed by the fire which destroyed his home. A post-mortem disclosed lead shot in her body. But its presence was accounted for by the fact that a large number of loaded shells exploded near her body during the fire. It was merely conjecture that her death was caused by the criminal act of Bass.

In the Johnson case deceased was shot and killed in a saloon by some one who escaped. Johnson was arrested miles away. No one identified him as the assassin. There were some suspicious circumstances, but they were just as consistent with his innocence as they were with his guilt.

The Scott case was a charge of larceny of cattle. Scott was shown to have been in the pasture with another person

driving a hack. Persons saw the team run away and overturn the hack in some brush. A cow and calf were found in the pasture with halter and rope on them. It was not shown that Scott had been near the cattle or that these animals had been in the hack. In fact, it was not even shown that any one had tried to steal the cattle. The proof scarcely raised even a suspicion.

In the King case two men were convicted of the burglary and larceny of a tailor shop. One of them had made statements, after the alleged conspiracy had ended, tending to show that King had planned the burglary and larceny with the convicted men. Outside of this clearly incompetent testimony, there was no substantial evidence tending to show that King had any connection whatever with the crime.

In the Frisby case defendant was the wife of the deceased, who was janitor of a bank, at the rear door of which his body was found. One Jones had confessed the killing and, after the alleged conspiracy was ended, stated that he killed deceased under an agreement to share his insurance with Mrs. Frisby and to go away with her. Jones did not testify to these facts. The evidence of the statement was inadmissible. There was no other substantial evidence connecting Mrs. Frisby with the crime.

In the Larkin and Harris case, Mrs. Harris was the wife of deceased. He came upon her and her paramour at a clandestine meeting. Larkin admittedly killed deceased in the pistol duel which ensued. There was evidence of self-defense on his part. Mrs. Harris was charged as an accessory before the fact. There was neither proof nor claim that she gave Larkin any aid or assistance in the killing. A statement, said to have been made by her long prior to the killing, indicated a desire on her part that something might happen to her husband so that she might be free from him. Such statement indicated no contemplated violence on her part.

We think it apparent that the facts in the cases discussed fall far short of the proof in this case pointing cir-

cumstantially to the appellant as the slayer of his wife. There is here substantial evidence that deceased was dead before appellant left home; that the Stillson wrench was taken up to the bedroom and used to kill the deceased before Yost came down stairs; that there were unexplained blood stains on appellant's pajamas and other articles which the slayer might have touched or used; that the only persons known to have been about the premises before appellant left the house were appellant and Yost and the testimony of both Yost and appellant fully exonerated Yost; that the rear screen door was hooked after Yost left and the front door was also locked after appellant left the house; that there was no evidence indicating that deceased, if alive, came down stairs after appellant left the house; that the back screen door was found unhooked after appellant left and there were no signs of a forced entrance through said screen door or through any of the windows; that the premises were under casual observation for several hours by the next door neighbor and no one was seen about the house during the day; that no disturbance was made by the dogs, which were in the habit of barking at the approach of strangers, and that there was at least some proof tending to show a motive on the part of appellant to be rid of his wife.

If the jury believed this evidence, it constituted substantial proof of guilt. It was for the jury to say whether such facts and circumstances pointed to the guilt of appellant beyond a reasonable doubt and excluded every reasonable theory of his innocence. If the jury believed beyond a reasonable doubt that deceased received the fatal blow before the appellant left his home, such fact discredited all of appellant's testimony not in harmony with that fact and rendered it certain beyond a reasonable doubt that appellant himself inflicted the fatal blow. The verdict of guilty conclusively shows that such was the finding reached by the jury. We are not authorized to disturb the verdict, unless procedural errors were committed in the course of the trial.

Although appellant's brief sets out numerous assignments of error and contains five paragraphs under Points and Authorities, the argument made in the brief goes almost entirely to the sufficiency of the evidence to support the verdict. We will consider such assignments briefly. Instructions 3 and 5 are assailed. The alleged error in them is not pointed out or discussed. Instruction 5 was a definition of the word "deliberately." As deliberation was not an element of the crime of which appellant was convicted, said instruction need not be considered. However, it appears to have been as fair to appellant as the court was justified in giving.

Instruction 3 submitted murder in the second degree. It appears unobjectionable in form and substance. The giving of an instruction upon murder in the second degree was justified and indeed required, because there was no direct proof concerning the facts immediately attending the killing. The homicide was accomplished by the use, evidently the intentional use, of a deadly weapon upon a vital part of the body. The law presumes the killing was murder in the second degree, in the absence of proof of attendant circumstances which tend to raise the killing to murder in the first degree or to reduce it to manslaughter. The appellant complains of the failure to give an instruction upon manslaughter. As no facts were shown tending to reduce the killing from murder in the second degree to manslaughter, such instruction was not called for.

Instruction 10 told the jury that, if it found there was no motive on the part of defendant to kill deceased, the absence of such motive is a circumstance in his favor; but that, if the jury believed appellant guilty beyond a reasonable doubt, it should not acquit him merely because of the failure to show a motive for the crime. This instruction was more favorable to appellant than he was entitled to, because it was susceptible of the construction that no motive had been shown. If the jury believed that appellant made the statement that he had been with another woman when he was supposed to be at work or bowling,

such proof had some tendency to show a motive for appellant to rid himself of his wife. If the jury believed that defendant made such statement, it was justified in finding it to be true, because appellant made such statement and it was against his interest to make it. There was, therefore, substantial evidence of motive. It was proper to give an instruction on motive, and appellant is not in a position to complain of the instruction given.

Error is charged because the special prosecutor constantly exhibited to the jury the blood-stained garments found upon the deceased, as well as her skull, which was removed at the post-mortem and was introduced in evidence. The places in the record where such exhibition or exhibitions occurred have not been pointed out. If counsel did not think enough of the point to direct our attention to the place in the record where such alleged error occurred, we will not be justified in going over the thousand pages of typewritten record with a fine-tooth comb to find it, even if it actually occurred. It is sufficient to say that the writer read and studied the entire record carefully with this contention in mind and did not discover any incident where an exception was saved to any such exhibition.

Error is assigned because the prosecuting attorney directed the sheriff to call the name of Marie Burke in the hearing of the jury when he knew she had not been subpoenaed and no subpoena had been issued for her. The State's theory was that she was the woman in the case. No objection was made or exception saved when this incident occurred. We will not convict the trial judge of error on account of an incident upon which he was not asked to rule. It is therefore unnecessary to consider whether such incident in fact amounted to reversible error, if proper exception had been saved.

It is said that the trial court erred in permitting the special prosecutor to argue to the jury that appellant was guilty of adultery as a motive for the crime charged against him, when there was no evidence of such adultery. This argument was evidently based upon the alleged state-

ment of appellant that he had been going with a woman other than his wife and the finding of a woman's photograph in his clothing. If the jury believe such statement was made and that the photograph was of this woman, the argument was not an improper deduction therefrom, as the trial court ruled.

Finally, it is assigned as error that the trial court erred in refusing to grant a new trial on account of newly-discovered evidence. This contention has not been urged in the brief or argued orally in this court. A large number of affidavits were filed by appellant and by the State, thus filling sixty-three pages of the record. We have read all of said affidavits. Most of the alleged newly-discovered evidence was merely cumulative or of an impeaching character. Such character of newly-discovered evidence does not justify a reversal where the trial court has refused to grant a new trial.

One affidavit was made by a woman who stated that her husband, from whom she was separated at the time, had confessed to her that he had killed Mrs. Henke. Without entering into a consideration of such proffered newly-discovered evidence, we think the trial judge doubtless came to the conclusion that, if the woman was telling the truth in her affidavit, her late husband had probably been merely engaged in a pastime popularly termed ''spoofing.'' The State filed an affidavit made by one of the deputy sheriffs that he had investigated the story and had found the woman's husband. The husband accounted for his time in such a manner as to preclude the possibility of his having committed the act and that said deputy sheriff later checked up such statements and found them to be true.

Another affidavit was made by a woman of the neighborhood who was visited by a tramp having a bloody hand during the afternoon when deceased's body was found. The State filed an affidavit tending to show that this incident had been investigated by the officers and that it had turned out that the hand of the tramp was bitten by a dog. It is not strange that, when such an atrocious murder has

State v. Henke.

occurred, the interest of the people of the neighborhood is strongly aroused and that they will put an undue importance upon incidents which otherwise would have passed unnoticed. The refusal of the trial court to grant a new trial upon such a showing was clearly not error.

This case has attracted widespread interest. The charge against appellant evidently aroused the sympathies of many of his friends who evinced a sincere belief in his innocence when testifying as witnesses in the cases. Appellant may not be guilty of the atrocious crime of which he was convicted; but that is not for this court to say. The only method of determining the facts in a felony case known to our Constitution and laws is a verdict by a jury of twelve men under the supervision of a trial judge. When there is substantial evidence to support the finding of a jury and the trial court has committed no reversible error during the presentation of the evidence and argument to the jury, its verdict is conclusive of the guilt of the accused, in so far as any fact can be conclusively determined. We are satisfied that the appellant was given a fair and impartial trial. No reversible error is shown to have been committed of which he can complain.

It therefore becomes our duty to affirm the judgment of the trial court, and it is so ordered. All concur.